Good morning everyone. We have six cases on today's argument calendar. The court will recess briefly after the first case to reconstitute the panel. Judge Maldonado will replace Judge St. Eve for the remaining five arguments of the day. We'll begin with Appeals Number 24, 1217 and 24, 1223 Griffith Foods International v. National Union Fire Insurance. Mr. Dupree, good morning. Good morning, Your Honor. Tom Dupree on behalf of National Union, and may it please the court. For 35 years, Griffith and Sterigenics operated a sterilization facility in Willowbrook. They intentionally emitted pollution into the Willowbrook community, leading to nearly 1,000 lawsuits. The district court held that we, National Union, had a duty to defend all of those lawsuits, even though our policies only covered a single year of the 35-year span that the facility was in operation, even though the underlying claims asserted by the individual plaintiffs indisputably fell within the pollution exclusion to our policies, and even though there is ongoing parallel state court coverage litigation simultaneously occurring in state court involving all 13 insurers who provided coverage over those 35 years. Mr. Dupree, can you, can you, there's a lot in what you just said, there's a lot in the case. Can you just break that, or let me, let me try to break that down a little bit. There's, there's an issue that you raise in your appellate briefs that you're quite, you're quite clear on, and that's this concept of whether the duty to defend can really be considered against the backdrop of a master complaint, the underlying complaint, whatever you want to call it, that way. And I think, in fairness to your position, that's an extremely serious question, but I'm not sure it's been raised in the case. Has that been preserved? Absolutely, Your Honor. The first place I would direct the court to is ECF 32, page 14. That is our opposition to their cross-motion for judgment on the pleadings in which we specifically called that point out, Your Honor. I have it right in front of me. That's what I thought you would say. I don't know how that puts the district court on notice as to the content of what you're actually arguing on appeal. It doesn't even, it doesn't even mention the master complaint. You're talking about footnote 8? Yes, the footnote on page 14. That's correct. It says that we reserve the right to argue that these events occurred outside the policy period. But, Your Honor, if I could, even putting that aside, even if this court were to say that that argument was not sufficient, please bear in mind that we raised this argument to the district court again and again and again. But after the district court ruled on the duty to defend, and I share Judge Scudder's concerns, I don't know how footnote 8 in your brief would have put the court on notice that you had a problem with using the master complaint for purposes of determining the duty to defend. Well, Your Honor, I think... It doesn't even mention the master complaint. I take that point, Your Honor, but I think the way it put the district court on notice is what we were doing was making clear that, yes, it was appropriate to adjudicate duty to defend with regard to these global coverage issues, pollution exclusion, sudden and accidental exception. But we were not saying, and that's why we specifically reserved the right to argue, that the duty to defend, even if it applied not outstanding the pollution exclusion and the like, still didn't apply to coverage occurrences that occurred outside the time period. In other words... But there's... The motion before the court was to determine the issue of duty to defend, and you were relying on the allegations in the master complaint in making your arguments why the duty to defend did not apply to your clients. So in the fact that you're relying on them and you drop a footnote preserving other issues, that doesn't mention the master complaint, I don't know how that could possibly preserve the issue. Well, Your Honor, I would just submit that when we said we reserved the right to argue that some of these, most of these occurrences, alleged injuries, happened long after our policy expired. When we told the district court we want to argue that, we are reserving the right to argue that, I think that was a clear... But when do you want to argue that? She's deciding the duty to defend. Because after she were to resolve those kind of global pollution exclusion questions, in other words, the way that, as this court knows, the way this often works in this type of litigation is that district courts will make kind of an initial call... But you don't get two bites at the apple at duty to defend. I understand the indemnity issue is out there, but you don't get one ruling on duty to defend and then to come back and say, well, we have more. Well, it's duty... Your Honor, it's duty to defend with regard to those common questions. It's not duty to defend with regard to individual lawsuits. Let me, let me put the question a different way. Here's, here's, here's what I would have, I would have thought that your client reacted to the motion for judgment on the pleadings by putting on the front cover of its opposition brief, hold on here, if what you're talking about is holding National Union responsible on the duty to defend for 100 percent, 35 over 35, that way. No way, no how. It doesn't work that way. And instead what you're doing is you're saying now, the district court would have been on notice then. What you're saying now is, well, we did. We preserved that issue through this footnote. It's not at all clear to me that that's what the district court understood you were doing. Well, I, I take that point, Your Honor. I don't think the district court... But you never moved to, you didn't move to reconsider this? Well, there I would respectfully disagree, Your Honor. In other words, subsequently... You tried to inject it through the, through the counter claims. I, I will, I have additional sites when, when Your Honor said that we didn't ask her to reconsider it. ECF 43, 46... On this exact point? Is that your status report? The first one is, but in other... That's not a motion to reconsider. Oh no, it was not a motion to reconsider, but with regard to Judge Scudder's question about, did we revisit this issue with the district court? We raised this issue, both in the status report, but also in, for example, the briefing on the damages, in our request to file a counterclaim, pretty much at every possible turn on at least eight separate occasions. The counterclaim is after the fact, though. It just, it surprises. I Your, your argument is, hey, we had plan A, and I got it, and you think, well, what if plan A doesn't work? What's plan B? We get hit with a hundred percent of this? Well, Your Honor, from our perspective, the district court, I take your point that she did not interpret our footnote the way that we intended it and that we thought it worked, but she had many opportunities. The court had many subsequent opportunities to fix the mistake, and it's, it's an easy fix to make. We simply said, we want to have an individualized determination. But you never moved to reconsider. Well, maybe you stuck it in the status, you, after the duty to defend ruling was already made, you filed some other motions. I mean, if a district court makes a mistake, and I, I'm not sure how she could have understood the footnote, as you have argued, but let's assume she made a motion to reconsider and explain why. That puts the court on notice, and I don't see any of your other attempts at raising this issue about the master complaint, putting her on notice or asking her to reconsider her duty to defend. That's the concern I have with your master complaint. I, I, I understand, Your Honor, and in fairness, we, nothing was styled a motion for reconsideration, but I would say in the substance, and it went beyond the status report, it was in our proposed counterclaims, it was in all the damages briefing, it was in at least six, seven, maybe even eight separate filings subsequent to the duty to defend ruling, in which we, in substance, asked the district court to allow us to make those individualized defenses. So could we have styled it as a motion to reconsider? I take the point, Your Honor, but in fairness, we raised this issue repeatedly with the district court. We made abundantly clear where that had gone wrong. I don't think there's a substantial argument from the other side to Judge Scudder's point that this is a potentially strong issue. There's no dispute that it is patently unfair and unjust to hold my client liable to defend claims from people who moved to Willowbrook decades after the policy expired. That's why I, so that's, that's why we raised it. That's exactly why I say raise it, write it on the front cover of the brief. And it's the big, it's the, it's the biggest issue in the litigation, and it's not been preserved. Well, I, I, even if Your Honor agrees that the footnote did not suffice to preserve it, I would ask the court to consider that we raised it repeatedly again and again and again, asked the district court to correct it, not through a formal motion to reconsider, but we asked her in substance to reconsider it. So I do think we preserved it. Okay, can I shift gears with you a little bit? Of course. Okay, the pending state court litigation that you mentioned in your opening comments, what, what bearing, if any, does that litigation have on our resolution of this appeal? I think it has very significant relevance, very significant bearing. In other words, how? Under, well, under Rule 19 and under this court's precedents in Stay Right and Evergreen, when you have this situation, namely federal court litigation involving a subset of insurers and state court litigation involving all global insurers, that Rule 19 requires dismissal of the federal court in order to permit and facilitate a global state court resolution. That's a straightforward application of what this court has said repeatedly in Evergreen and Stay Right. The state court litigation, though, didn't commence until after the, the duty to defend judgment, correct? The, I believe the state court litigation, they filed their lawsuit against all months, correct, at months after they got the duty to defend. That was their strategic decision. I mean, they can time their lawsuits whenever they want, but the minute they filed that lawsuit and identified all of the other insurers, we did two things. One, we tried unsuccessfully to implead those other insurers in the federal action, and number two, we moved for Rule 19 dismissal. Why did you do that in advance? Why didn't you try to implead them into the duty to defend action before the state court action was filed? We didn't know all the insurers, Your Honor. Discovery could have determined that. Well, but this is judgment on the pleadings. In other words, we, we tried to find out who they were. I think we were able to maybe identify one. We certainly were not able to identify all, and as soon as we found out their identities, that's when we moved. We certainly did not sit on our rights in any sense. We moved very, very promptly. I would also point out that under Stay Right, under Evergreen, under the plain text of Rule 19, the, the timing of this, in other words, the fact that the duty to defend ruling issued and there was water under the bridge in the federal court litigation, that doesn't play a role in the Rule 19 analysis. There are cases, we cited one from the Fourth Circuit, where courts grant Rule 19 subsequent to final judgment. I don't know that you're, I don't, you're suggesting that Rule, Rule 19, the, a proper Rule 19 analysis turns upon the presence of parallel state litigation. I think, doesn't the Rule 19 analysis turn upon the, the application of the language of Rule 19? Of course, Your Honor. It turns on the language of Rule 19, which it requires, as the court knows, kind of a two-step analysis. You assess who are the required parties under Sub A, and then you apply the factors under Sub B. I think Stay Right and Evergreen are particularly relevant and helpful to this court because they show how this court applies those Rule 19 factors in this exact context. How do you get around our opinion in Davis on the first prong of Rule 19 determining who the existing parties are? Well, I don't, if I'm remembering correctly, I think they cite Davis for that point, but I don't think Davis was this situation. I don't think that was kind of a situation where you had multiple insurance. Davis made it clear that the, that the, in looking at that first part of the analysis, you look at the parties to the litigation. Well, and, and you're asking us to look at the absent insurers for that first piece of the analysis. Well, in part, I mean, in other words, the first piece of the analysis, as the court knows, there are three separate independent bases on which we can establish required party. I think what Stay Right says is that in making that assessment in terms of who's required under, I think, pretty much any prong, you do take into account other insurers who are not absent. That's the straightforward application of Stay Right. And that's why I think Davis, Your Honor, is far less persuasive on the Rule 19 issues than Evergreen and Stay Right. Because again, those cases arose in this precise context where you have two parallel cases going on. To be sure, this court has not said that there is a per se rule that you have to name other insurers, but I think... What's the risk, what's the risk here of inconsistent judgments, though, between the federal court and the state court? I mean, I think Stay, Star Right and Evergreen are different in that way. Well, I think the risk in this case, I think the risk of inconsistent judgments is significantly high. The state court coverage action, which is still in its infancy, in its early stages, that potentially could result in a judgment that those 12 other insurers do not have a duty to defend. For example, that they fall, the claims fall within the pollution exclusion. If that happens, that obviously is inconsistent with what the federal court in this case ruled, and that would redound to immense prejudice. The federal court ruled as to your client on the policies in question. Correct, but I don't think there are material differences between any of the policies here. I mean, the other side kind of does a general hand-waving gesture and saying there are important differences, but their brief tellingly never identifies a single difference. But the larger point is that all of these policies from all 13 insurers are general, garden variety, commercial liability insurance policies that contain pollution exclusions, all of these things. The state court is adjudicating the exact same facts, the exact same state law claims that the federal court did. It is a textbook example of duplicative litigation. It's why we have Rule 19, to prevent this sort of scene from unfolding, where you have a federal court adjudicating issues as to one insurer, simultaneously that the state court is adjudicating the exact same issues as to all other 12 insurers. Isn't the question inconsistent obligations, not inconsistent adjudications under the rule? It is. I think it's inconsistent or conflicting obligations is one piece of it, yes. Because you keep arguing adjudications, and I don't think that's the proper inquiry. I think the proper inquiry is inconsistent obligations. I take your Honor's point, but I would say that the adjudications, I think also is relevant to the duplicative adjudications point. In other words, the fact that the federal and state courts are litigating the exact same thing. That's a separate Rule 19 issue. It is, but it's independently sufficient for us to win on, Your Honor. If I could say a few words in my remaining time on just the merits of the duty. You may be expanding the time, so go ahead. Oh, okay. Actually, before you move, I want to ask one more question, please, about Rule 19. What is the prejudice to the absent parties here? Sure. The prejudice to the absent parties would be if we prevail on our claims that we do not have a duty to defend, which I'm going to address presently, and then the absent insurers would face the mirror image of the situation that we might face. But in light of the court's ruling that you do have a duty to defend, and you're responsible for the hundred percent for the full time period, what's the prejudice to the absent insurers? Because they're not on the hook for anything under Judge Roland's ruling. I take that point in that universe, Your Honor, but in other words, the Rule 19 assessment focuses on kind of the state of play at the time the Rule 19 motion is filed, and so we're contesting our duty to defend. You think we need to look at, for the Rule 19 in determining prejudice, we look outside of the federal litigation for absent insurers to see potential other prejudice in other cases? Well, I mean, I think the prejudice analysis necessarily turns on what prejudice could arise from potentially conflicting rulings in the federal forum and the state forum. So I do think it requires, but again, this is, I'm not going out on a limb, this is what Evergreen and Stayright say, that you do have to look at what's getting adjudicated in the state court case in order to make an assessment of the potential prejudice from allowing the federal case to proceed. If I could address the duty to defend issues, we believe strongly that the pollution exclusion applies here. This, frankly, strikes us as fairly straightforward. This court has, you know, at least currently, takes a strong textualist approach to insurance policies, and as this court said in many cases, pollution is pollution. And the idea that the district court embraced, that there is an unwritten, judge-made permitting exception that is triggered by the pollution exclusion language, I don't think is consistent with the way that this court, or frankly, most courts... How does Imperial Marble square with your argument? Because it seems if Imperial Marble applies, that the issue is not clear, that it's ambiguous, and we have to find against you. I would say two things. So I don't, is your argument that Imperial Marble doesn't apply, or is your argument that even if it does, it doesn't matter, or both? It's both. It's all of the above. So the point about does it apply or not, we think the Scottsdale case, if the two are deemed in tension, the Scottsdale case controls. I think that's fairly straightforward, that this court follows... Would it though, since it's not Illinois law, this is Illinois law, Imperial Marble was Illinois, Scottsdale was Seventh Circuit, didn't cite Imperial, so given that Illinois law applies, would Scottsdale trump it? Oh, I think so. Oh, I certainly, the way this court historically has approached this situation, is it looks to its prior precedent in terms of interpreting, and the pollution exclusion is common. I mean, they're in all states, and so I don't think there are material differences on a state law level. But this court typically would look at its own prior precedent, rather than adhere to the view of an intermediate state appellate court. So the first part of my answer to Your Honor's question is, we think Scottsdale controls, Imperial Marble doesn't. But even if we are in a world where we have to engage in Imperial Marble, I think Imperial Marble is clearly distinguishable in several respects. For one thing, in Imperial Marble, the permit at issue authorized a specific level of emissions. This doesn't. The permit in Imperial Marble specifically said, if you adhere to this permitted level of emissions, you're basically immune from civil liability. But wasn't that because when they got the permit here, there were no regulatory ceiling or floors for this particular contaminant? I don't know what the state of regulation in Illinois was. I think at the time when they got the permit, that there wasn't anything saying you can only emit X amount. But fair enough. But even if that's the case, the fact is, is that in this case, there was no state authorization for a particular emissions level, which was not the case in Imperial Marble. Second way Imperial Marble is very different is that in Imperial Marble, the state's permit basically said, if you adhere to the authorized level or go below it, you're immune from civil liability. This permit doesn't. This is one of those pollute at your own risk permits, where they said, yes, we are authorizing you to open this facility. We're not authorizing or specifying any particular level of emissions. We frankly haven't focused on it. And if you do it, you very well could be held civilly liable. So I think Imperial Marble, even if it applies, is plainly distinguishable from what we have here. So the other question I have about it, I'm not convinced that, I'm not sure whether Imperial Marble reflects a correct construction of the Illinois Supreme Court's decision in columns or columns. That's that carbon monoxide case, which is a very different situation. It's not a traditional pollutant. So I don't, I don't know that that the Illinois Intermediate Court's opinion in Imperial Marble is a fair prediction of how the Illinois Supreme Court would decide this if the issue was squarely before it. I could not agree more, Your Honor. I mean, to me, at least, it's not even a close question. In other words, Imperial Marble is a serious outlier in both what the Illinois Supreme Court has been saying and what, frankly, insurance courts, deciding insurance cases across the country, have been holding. So in other words, what I wonder about is if you say, all right, I'm sure your adversary is going to say Imperial Marble's on all fours. It's squarely controls. It's a hundred percent on point. We'll see in a minute, okay? That way you say, okay, fair. That's step one. But step two is you have to, you have to have some degree of confidence that it aligns with where the state's highest court might be on the question. And if you have indicators that there's, that there's an inconsistent alignment there, I think you should pause or at least wonder about it. Absolutely. And I mean, Your Honor has very ably stated the task that's before a federal court when it's addressing these issues, is you can't accept intermediate appellate court decisions at face value. This court's obligation and duty is to assess how the state's highest tribunal would assess it. And you're absolutely right. Imperial Marble is seriously out of step with what the Illinois Supreme Court has said. Are there any Illinois cases going the other way involving permits? I just haven't seen the issue come up. You're right. At the appellate court level? It hasn't. I mean, in fairness, I know the other side cites, I think it's the Bible Pork case, which is a follow-on to Imperial Marble, but, but there's not a lot on it. I mean, it is a question that the Illinois Supreme Court at some point, I'm confident, will step in before too long and resolve. But I agree with Judge Scudder's fundamental point that it's seriously out of step. Mr. Dupree, before we give you a break and go to the, can you, can you pivot on one issue and just, can you summarize for us what, what's your clearest articulation of the open factual questions on whether stereogenics is an insurer within the meaning of the policy? Absolutely. The first open factual question is whether Microbiotrol, which was the subsidiary of Griffith Foods, had insurance coverage at the time of its creation. As the court knows, that is a required predicate for being a covered party under the contract, that that subsidiary not already have existing insurance coverage at its time of creation. That's an open question. There's nothing in the master complaint that remotely says anything like that. Clearly a question where we were at a minimum entitled to discovery. The second open question is whether, as they claim, insurance rights migrated somewhat magically from Griffith Foods back in the 1980s all the way up through stereogenics in the 2000s through what even they say is a complex web of corporate transactions. The district court basically said, well it looks like it was kind of a bunch of mergers and so we think that the insurance rights kind of transmogrified through all the various merger deals and ultimately rested and were vested in stereogenics. But that's actually not what the master complaint says. Master complaint talks about assuming the liabilities, but of course insurance coverage is not a liability, so that doesn't get them there. That's an open factual question. In fact, I think my friend's decision to submit to this court a stack of corporate transactional documents they got from the Delaware Secretary of State is positive proof that we do need more information and resolve these factual questions before we can make that coverage decision. What's the second open issue? The first was did it have insurance coverage at its inauguration and the second question is whether the insurance coverage, if it did exist at the beginning, migrated through all those corporate transactions to vest in stereogenics at the end of the line. Yeah, whether it's a successor subsidiary Exactly. Is there anything about either of those factual issues if the court had to sift through everything and make a determination that would impact anything about the facts in the underlying cases for liability? No. In other words, the question of corporate ownership, I think, as I understand it, I don't think even the other side suggests that for a minute. Can I ask one more question, please? I just want to confirm that you are not appealing the damage award as to Griffith. That is correct. Are you hoping we don't get there? I understand that. We sure are appealing the damage award, the $101 million, which I didn't get to, but I won't escape the court's notice that we deserve more on damages. By God. That's the whole Taco Bell issue. We got it. You got it. All right. Thank you. All right. Thanks. We'll give you a little bit of rebuttal time and we're gonna, we'll expand time in kind to the other side as well. So we'll start with Mr. Feinemann. Good morning. Good morning. May it please the court, counsel. I'll be handling the issues that are in the heterogenics only brief, as well as the rule 19 issue in the joint brief. I do want to start off with the master complaint, though, in the district court and the court's questions were right on point. In the district court, in arguing the duty to defend issue, which was it was, which was resolved in August of 2022, National Union focused solely on the master complaint, you know, putting aside the footnote, which really didn't say anything, and not any of the short form complaints. And it makes sense that they would do so. The case was, the underlying case was being litigated in Cook County under the master complaint for purposes of pretrial and discovery. And the master complaint is in the joint appendix at pages 39 to 157, and it lays out everything. And if you look at a short form complaint, and there's one example in the joint appendix, it's a joint appendix 277 to 281. It's basically what's your name, what's your injury, who are you suing, and which of the dozen and a half counts in the master complaint. How should it impact the analysis, assuming it was preserved, which is a big assumption, but how should it impact the analysis that the master complaint was only for discovery and pretrial purposes? Well, that's, that's where most, or that's where a good bulk of the defense costs were incurred. The way the case was litigated in the circuit court, it was litigated, there were a number of general issues, as you might imagine, in any kind of a mass tort situation, a number of general issues. And when the individual cases were set for trial, that's when the parties would focus on the individual cases set for trial. And as it happens, the individual, all the individual cases that were set for trial, two were tried, one was on deck, and there were like two or three others. All of those, all of those plaintiffs alleged exposure during the 1983 to 1985 period where the policies were. So as a practical matter, it wouldn't have mattered at all. And to the extent, and the, in terms of recovery of defense costs, in the reams and reams of spreadsheets and invoices, if there was attention being paid below and charges being incurred, legal fees being incurred, costs being incurred, as to the individuals, those were, those were drawn out and you can see that in those. Mr. Fetterman, that may very well be correct. And as a practical matter, I can certainly understand why they took this approach. But why does it not make sense and why does the footnote not preserve the argument for the district court? In other words, why are they not telling the district court, look, the elephant in the room is the duty to defend. We get that. And we get, I completely understand, it's discovery and all, that's where all the costs are. But they say, but there's this little issue that if you decide that we have a duty to defend, you next have to take on whether there was an occurrence for which we have a duty to defend. So that's next. Why does that footnote not put the district court on notice that something else has to happen here? But, but, talk about an elephant in a mouse hole. I mean, let me just, let me just say it for one reason. I mean, it just seems to me you've got 35 years of pollutants being emitted into the air and you've got a two-year policy period back from the early 1980s. Shouldn't it have been obvious to the district court what this footnote meant and that something had to come next? How could you be responsible for defending litigation for individuals that didn't even live there for perhaps 20 years after the policy expired? Right, and had it been brought, I mean, is it fair to bring something to the district judge's attention in a footnote, particularly where, I have some views on that, but particularly where in arguing the eight corners and, you know, in matching up the underlying complaint to the policies, in arguing the eight corners, what National Union was arguing for the corners were the match of complaint. And that makes sense. I understand that from a strategic standpoint, right? Yeah, that was plan A. Plan A was to just beat it on, beat it on the, just the straight-up merits on the duty to defend under the turn, under the eight corners rule. Right. Well, I didn't, but I, well, anyway, you, go ahead. No, I'm sorry. Go ahead. Yeah, it's, but when you're litigating duty to defend, you don't have plan A and then you say, okay, if that doesn't work out, we're gonna go back on plan B on the duty to defend. You make all your arguments while the duty to defend is being litigated and they didn't do so. And whether that was a mistake or not, I don't know, but it really, again, given how the case was litigated, it was litigated as a whole in the circuit court. Most of the issues were general and, again, all of the cases that were set for trial fell within that period. So, again, I can't reconstruct what was going through their mind and it wasn't, it wasn't Mr. Dupre below. It was another law firm. You know, I can't reconstruct what was going through their mind, but perhaps they thought it just wouldn't have made a difference. And if they thought it would make a difference, they would have argued, look, Sterigenics and Griffith are arguing the eight corners rule. In order to have the eight corners rule, four of the corners have to be the complaint. And Sterigenics and Griffith haven't put, with the exception of the one short-form complaint that's in the joint appendix, haven't even put the complaint, so four of the corners are missing. And they didn't argue that. Everybody was assuming, everybody proceeded under the assumption, which was correct, that four of the corners were the master complaint because that's where everything was laid out and the details, the name, rank, serial number, what's your injury, what counts are you suing on. Mr. Feiderman, can you address the pending state court litigation? It's the same question I had for Mr. Dupree. What if any relevance is there to it? And more broadly, and I don't want you to reveal confidences or anything like that, but what can you say about the reasons that the state court litigation was commenced? But I know you ended up joining it, or Sterigenics ended up joining it, so maybe that question's better for Griffith. The question may be better for Griffith, but Griffith initiated it and we joined, and it's important to look at the timing. The duty to defend ruling was made in August of 22, and under those policies it was an unlimited defense and $1 million in indemnity coverage. The Komuda case, which was the $360 million verdict, was in September of 22. Defense verdict was rendered in November of 22, and at that point there was, you know, there was a lot of indemnity. There was a $360 million verdict, 800 more plaintiffs, and at that point, and again Griffith could probably speak to this better than I can, the state court coverage case was initiated, and the gist of the state court coverage case is indemnity. There is, you know, to be fair, there are being asked for defense costs as well, but if the defense costs are affirmed in this case, I can't imagine there'd be any appetite by Sterigenics and Griffith to pursue defense costs in the state court case. There's another timing issue. The National Union would probably want to seek contribution. I don't know if they could do that in the state case or... They can do that in the state case, and that's our whole point, and that's what the joint and several liability principle in John Crane and ITW and Zurich holds, which is the insurer and in Roanoke, the insurer gets to pick which insurer it's going to go after, and then if there's liability, that insurer can seek contribution from the other insurers, and in fact, you know, I want to touch upon one of the points. As Mr. Dupre mentioned, National Union tried to include the other insurers in this case, but I have to make one correction. That didn't happen. It didn't happen after Griffith initiated the state court coverage suit, which was in January of 23. It happened in the fall of 22, after the duty to defend ruling was issued by Judge Rowland and before the state court coverage suit was initiated, and that's important because in that motion for leave to file a third-party claim, and by the way, had National Union brought those third-party claims along with its answer within 14 days of its answer, it would not have had to seek leave to do so. Mr. Feynman, I want to shift gears to the insured status question, and I have concerns that the district court looked to the eight corners and didn't go beyond the eight corners in light of Erie versus Errol and other Illinois court cases when determining the insured status question. So can you address that, please? Of course. So the eight corners rule is the general rule under Illinois law, as this court has recognized. But not necessarily for the insured status question. Yes, it is for the insured status question. What are you relying on for that? I'm relying on the Hacker case in the Illinois Appellate Court, which we cited in our individual brief, and Hacker held the question whether a person qualifies as an insured for duty to defend purposes is governed by the eight corners rule, and tellingly National Union said nothing about the Hacker case in its reply, and that's a clear articulation. What year is that? The Hacker case, I... Okay, go ahead, keep your thought going. And then there's the Metro Paramedic case that this court issued, and I do know the year of that one, it was 2016. That seems to conflict with Errol that came out after Metro Paramedics. I guess the Errol, and Errol is a Illinois Appellate Court case. Correct, and Metro Paramedics is a Seventh Circuit. Right, right. So in terms of the order of battle, the District Court had to follow Metro Paramedics as opposed to Errol. It would have been different had it been the Illinois Supreme Court following up Metro Paramedics. And so what, I guess the cases that that you're addressing, so Metro Paramedic clearly applies the eight corners rule to the question whether a party is covered, insured, and it did so even, because the complaint in that case, oh I'm sorry, I'm out of time. You can continue, go ahead. Yeah, the complaint in that case alleged that there was a joint venture. The actual contract set, disclaimed a joint venture, and this court held it doesn't matter because the underlying complaint alleged a joint venture. That's all that matters. In terms of the the other cases that National Union is relying upon, those fall into the bucket of an exception to the eight corners rule, which applies if the insurer, well the insurer can either defend under a reservation of rights, or it could bring a declaratory judgment claim. And all of the cases, all of the cases that National Union relies upon involve the situation where the insurer did one of those things, mostly. But the court's reasoning didn't seem to rely on the fact that the insurer brought the declaratory judgment. That didn't seem to be pertinent to the you could go outside of the eight corners rule. Factually, you're correct, but I don't see the significance of that to the ruling of you could go outside the eight corners. I mean, I think this court in the landmark case, in the Metro Paramedics case, held that that is that is essential to getting outside of the eight corners rule, which is bringing a declaratory judgment claim. And again, I'm out of time if I could just finish the thought. And you know, the question is did did National Union bring a declaratory judgment claim? They tried to after the duty to defend ruling was issued in the fall of 22. But by then, it was too late. So what National Union does is it points that to the general denial in its answer. And this is very important. It's at page 217 of the Joint Appendix. And this is what National Union points to. It's actually what Judge Roland pointed to as well in denying Griffith's estoppel motion. It's a general denial. And yes, it does utter the word declare, but it does not seek a declaratory. It's in the general denial section. It's not even in the affirmative defense section. So you don't have the situation under Civil Rule 8c where you construe affirmative defense as counterfeits and vice versa, if it makes sense to do so. It simply asks that the court find and declare that the plaintiff is not entitled to any relief or remedies. Is that seeking a declaratory judgment? Is that declaratory judgment claim within the meaning of the exception to the eight corners rule that Metro Paramedic and Landmark articulated? I would think not because it would, if that, if the exception could be satisfied by simply showing up and answering, in other words, by simply not defaulting when the insured goes to court, then the eight corners rule would be rendered innovative. Mr. Funderman, in closing up before we go to your colleague, can you, you started before we started interrupting you by saying you wanted to address the Rule 19 issue. Can we hear from you on that? Sure. Well, there are a number of issues that I don't want to take up too much of the court's time. I guess what I'll do is... How about the point, how about the point that your adversary is making that the issue is controlled by Starr Wright and Evergreen? Yeah, it's not. True enough, Starr Wright and Evergreen Rule 19 cases that arose in situations where the insured sued the diverse insurers in federal court and the non-diverse insurers in state court, and from that, National Union makes an inferential leave, which is not warranted, that Rule 19 is automatically satisfied in those circumstances. It's not. Either by operation of the policy language in Evergreen or Starr Wright. Evergreen is the one that had the apportionment provisions, right? So you needed everybody in the same room in that case. And in Starr Wright, there were excess in primary policies. So the excess policies would come into play only if the primary policies were invoked and exhausted. And so you had an interdependence, an interrelationship, as Davis said, in another context, between the contracts, between the two sets of contracts. One set of contracts being between the parties that were actually in the case and the other set of contracts being between one of the parties in the case and the absent party that the defendant was arguing was a required party. So because there wasn't that interrelationship, wasn't interdependence in Davis, that's why the Davis court, this court in Davis held that Rule 19 did not require dismissal under, through the vehicle of Rule 12B7. And Roan Palonk actually made this point in discussing Evergreen. And it's really the only way to make sense of Evergreen. What Roan Palonk said is if the situation of Roan Palonk involved excess in primary policies where there was an interrelationship, there was an interdependence, in that situation, Rule 19 would be satisfied. But if they were all primary policies, which is our situation here and there is no interrelationship, there is no interdependence, in that situation, Rule 19 need not apply. Okay. Why don't we hear from your colleague? Can I ask one more question? Oh, sure. Sure. I'm not going to let you go quite yet. On the damages question. Right. The Taco Bell makes clear that a court has to make an initial assessment that there are market incentives to economize before the presumption kicks in and before you go on to the damages. And I don't see where the district court judge made that specific determination here. She makes clear she's looking at the sworn declarations and relying on them, but it looks like that's at the second step and not the first step. And I know National Union didn't raise this issue, so I'm springing it on you. But I have some concerns that that first important step of Taco Bell would be the presumption. Right. I mean, I think if you look at the portion of Judge Roland's order that dealt with Griffith's motion for past defense costs, which is on page 17, that portion of the opinion articulates the standard from Taco Bell and USA Gymnastics and Medivante about market incentives to economize. And if there are, there's no occasion for painstaking judicial review. Judge Roland then went in section F, which starts on page 19 of the opinion, and just jumps in, doesn't rearticulate. But I agree she articulated the standard. My concern is that she didn't make that assessment under the standard, the initial that there has to be a market incentive to economize assessment. Right. I would point the court, if the court's concerned about that, which apparently it is, I would point the court to the discussion on page 19 in the last full paragraph of that opinion, where Judge Roland addresses the sworn declaration of Assistant General Counsel Martha Sullivan, where, and in those declarations, and there were three of them, if not four, Ms. Sullivan averred that there was, she paid very, very close attention to the fees, sought discounts, sought write-offs, entered into AFAs, and it almost stands to reason that when you're a company and you're facing mass court litigation that is incredibly expensive, and you have no assurance of being reimbursed, that, and again, there's certainly an incentive to economize. And I would also point the court to the carryover paragraph on pages 19 and 20, which I think also address the issues that you raised. Okay. Thank you. Okay. Thank you. We'll hear from Counsel for Griffith. Good morning. Good morning. May it please the court, Soap and Shop, or Griffith Appellees. I'd like to address the court's fairness concern and then discuss two other independent reasons why National Union cannot show that the pollution exclusion applies. The duty to defend is the provision of a service. It is much broader than the duty to indemnify. It's effectively litigation insurance, and that's what Griffith contracted for. And that's why if even one allegation in a complaint under Illinois law potentially triggers coverage, the insurer has the obligation to provide a complete defense. And that brings me to the personal injury coverage and the sudden and accidental exception. Those are two independent reasons, in addition to the permitted emissions doctrine, why National Union cannot show that the pollution exclusion applies. The policy does not have a pollution exclusion that applies to personal injury coverage, and that is undisputed. The facts alleged in the complaint could support a claim of private nuisance. Repeatedly in the complaint, underlying plaintiffs mentioned the word lived. They mentioned that Griffith allegedly located the plant in a residential community. At JA 86, the complaint mentions that 19,271 people were living within a mile. At JA 119, the complaint alleges that their contact with ethylene oxide was offensive and harmful. But I don't see any allegations that are property-based in the master complaint saying that the ethylene oxide emissions evaded the underlying property. You have these general allegations that you've identified that suggest more in the air to me than in the property. And that's what the person, unless I'm misreading it, that's what the personal injury would cover, these property-based harms. The text of the policy says that personal injury is defined as wrongful entry or eviction or other invasion of the right of private occupancy. And that's at JA 231. And that includes air-based emissions. And the underlying plaintiffs did bring a public nuisance claim at JA 121 and 126. And at JA 45, underlying plaintiffs allege loss of normal life. At JA 83, underlying plaintiffs allege that exposure to ethylene oxide irritates their eyes and their nose. These are all plaintiffs, many of them, the vast majority of underlying plaintiffs lived in Willowbrook. And the complaints focus on the residential community, the experience of living, the irritation could support a private nuisance claim. So is your argument that it would fall under this other evasion rather than the property? That's right, Your Honor. That's right. All you're doing with that, I think, don't let me put words in your mouth, is what you're saying is that in a world where these emissions are occurring, that they could affect your use and enjoyment of property, of your property, your community, et cetera. You're going to be less likely to go outside, do this, do that. And under the duty to defend standard of possibility, is it possible to read the underlying complaint as supporting a claim for personal injury? You're saying, yeah, it's possible. That's the argument. That's exactly right, Your Honor. Yes. That's exactly right. What can you say about the, I want to go back to the question I asked Mr. Fineman about the state court litigation. Is there anything you're comfortable saying about why Griffith commenced that? I'm not looking to put, I'm not asking for any confidences or anything, but when I see that there is the defense cost duty to defend issue in the state court litigation, what confuses me about it, in addition to coverage questions and indemnity questions, I thought, why would they go commence that litigation after a very substantial victory in the district court? What I would say, Your Honor, is that the plaintiff is the architect of their own lawsuit, and Griffith's contract with National Union exists separately and independently from their contracts with the various state court insurers. Yeah. Okay. Yeah. I'd also like to discuss the sudden and accidental exception to the pollution. Can I ask one more question on the property or the personal injury? If we, suppose for discussion purposes, we were to agree with you on that. Do we even have to address anything involving the pollution exclusion or the suddenness exception or anything like that? You would not, Your Honor. That is an independent ground to hold that the pollution exclusion doesn't apply because National Union agrees that there is no pollution exclusion with regard to the personal injury coverage grant. Okay. On the sudden and accidental exception, as with the personal injury situation, the underlying complaint alleges sudden and accidental discharge. At JA 49, the underlying complaint mentions the plans to address accidental release of ethylene oxide. At JA 92, the complaint alleges that Sterigenics and its predecessors routinely permitted chamber doors to be left open, thereby allowing ethylene oxide to escape directly into the environment. At JA 110 and 11, the complaint alleges Sterigenics and Soterra declined to take measures to improve fugitive emissions. At JA 113 to 116, alleging that Sterigenics failed to supervise its employees, which resulted in unintended leaks, spills, or emissions. And under this broad duty to defend standard, these allegations constitute allegations of sudden and accidental discharge, dispersal, release, or escape. And that is another independent ground to hold that National Union cannot rely on the pollution exclusion to its duty to defend. Another point on fairness, National Union is free to seek contribution from the other insurers once it pays defense costs and its claims then become ripe. This court should reject National Union's attempt to delay through certification. National Union disobeyed the district court's order requiring it to provide a defense to Griffith and Sterigenics. This court should affirm. Okay, Ms. Shaw, thank you. Mr. Dupree, we'll give you five minutes for rebuttal. Thank you, Your Honor. Let me start with the personal injury question. I would submit Judge St. Eve has it exactly right in that the allegations in the master complaint simply do not allege any injury to property. I take Your Honor's point, Judge Scudder, that could you have drafted a complaint that talks about how polluted air interfered with your property rights and prevented you from, you know, using your backyard? You could have written a complaint like that, but they didn't. That's the point. The idea that you can draw inferences and things like that, that only goes so far as what the factual allegations in the master complaint say. And here, Judge St. Eve is exactly right. I would defy anyone to read that 118-page master complaint and find allegations of harm to property. What about Ms. Shaw's point that it falls within the other evasion? It's other invasion to the right of private occupancy. In what piece of that definition you look at, it all comes to rest on whether they have alleged a property-based violation. They have not. In fact, they do allege public nuisance, which, as this Court knows, is not a property-based violation. Private nuisance, to be sure, is, but the master complaint doesn't allege private nuisance. It doesn't say anything about these are, you know, homeowners. It doesn't say anything about how they were impeded from making use of their property rights. That's why this cannot be sustained on the basis of the personal injury claim. There's nothing in that complaint that alleges harm to property. Second point, on sudden and accidental, I think that issue is decisively resolved by the Illinois State Court's fruit-of-the-loom decision. That case makes abundantly clear that, whereas here, you have a complaint that alleges a deliberate, ongoing, 365-day-a-year, 24-7 polluting factory, that the fact that over the course of those decades, an employee on a Thursday afternoon tripped and spilled some hazardous materials, that doesn't blow up the pollution exclusion. It can't. If it did, the pollution exclusion would be rendered a nullity. How could you have 35 years of factory operations and, in the course of that, not have one or two fringe spills? That's what decides this case. Fruit-of-the-loom, straightforward application. That's why the sudden and accidental exception does not apply here. The third point, on the Court's questions to my colleagues about the master complaint issue and whether we preserved it, I realize I may not persuade some members of the Court that our opposition to their motion preserved it. But if it didn't, I would direct the ECF 52 and 90 in the Sterigenics litigation. That's where we raised the issue, not status reports, but we directly raised this issue that Judge Kirsch highlighted to basically say, we want to fight out when these occurrences occur. We don't think that was decided. What are those filings? I got the numbers, but what are they? Oh, sure. ECF 52 is our response to the joint opening brief of Sterigenics and food in response to the Court's August 25th order. And the pages I would cite are pages 2 to 6 and 12. Was that before or after the duty to defend? These are after, Your Honor. And that just goes to my point that we raised this again and again and again. We gave every opportunity to fix it. I mean, this is an $110 million case. And we said, here's the mistake. Again, my colleagues don't make a serious argument that this is not clear error to force us to defend claims from people who moved to Willowbrook in the year 2010, decades after our policies expired. We raised it again. We raised it in ECF 90 to Judge Scudder's question. That was National Union's opposition to their motion for past defense costs. There it's pages 2 and 5 through 9. I have many other examples. Those are just two of the ones I raised, where as soon as she issued that duty to defend ruling, we immediately ran to the barricades. We gave her every opportunity, every opportunity to correct it. So the idea that we somehow forfeited or sat on our rights is wrong. And look, this court obviously has the discretion to overlook forfeiture in the interest of avoiding plain error and achieving justice. On the Rule 19 point, the one point I would like to leave this court with is that the situation in which we find ourselves, these ongoing litigation, the one here in federal court, the one unfolding today down the street in state court, this was brought about by the deliberate litigation strategy of the other side. They were the ones who brought this global consolidated proceeding. They made the decision to do that, to raise this and resolve these issues in the global proceeding. In fact, when one insurer went to Delaware and tried to get a duty to defend ruling, they went in and opposed it. Why? On the theory that it would interfere with their global consolidated coverage litigation in Illinois. And they succeeded. They persuaded the judge to stay its hand so that these coverage issues could be resolved in this global issue. So for that reason too, Your Honor, this is a classic case where this issue never should have been resolved to the district court. I have points I'd like to make, but in the interest of time, I won't on damages. I'm hopeful the court won't need to get there because Judge St. Eve, you're absolutely right. The district court didn't give this the thorough review it needed to do. But in all events, we do ask that this court reverse the judgment below. Mr. Dupree, thanks to you and your colleagues, Ms. Shaw, Mr. Feynman, we really appreciate the advocacy. We'll take the appeals under advisement. The court will be in recess to reconstitute the panel.